1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

SHANNON CAMPBELL, et al.,

          Plaintiffs,

   v.

CITY OF MILPITAS, et al.,

          Defendants.

Case No.  13-cv-03817-BLF

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**[RE:  ECF 37, 45]**

Animal rights activists Shannon Campbell ("Campbell") and Sherisa Andersen ("Andersen") (collectively, "Plaintiffs") claim that Milpitas police officers unlawfully detained them at the Milpitas train depot and thereby interfered with their efforts to film the unloading and transportation of circus animals belonging to non-party Ringling Bros. Circus ("Ringling" or "the circus").  Plaintiffs sue Milpitas police officers Ronald Gordon ("Gordon"), Gene Lee ("Lee"), and Craig Solis ("Solis") (collectively, "Officer Defendants") as well as the City of Milpitas ("City").  Before the Court are Defendants' motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment.  The Court has considered the briefing, the admissible evidence, and the argument presented at the hearing on January 8, 2015.  For the reasons discussed below, both motions are GRANTED IN PART AND DENIED IN PART.

## I.  BACKGROUND[1]

Plaintiffs are members of Humanity through Education, "a Bay Area grassroots group dedicated to the humane treatment of animals and educating the public about the abuse and mistreatment of animals in circuses."  Campbell Decl. ISO Pls.' Mot. ("Campbell Decl.") ¶ 2, ECF 41; *see also* Andersen Decl. ISO Pls.' Mot. ("Andersen Decl.") ¶ 2, ECF 40.  When Ringling performs in San Jose, California, its elephants and horses customarily are unloaded at the San Jose train station and walked to the San Jose Arena ("Arena").[2]  Campbell Decl. ¶ 5; Andersen Decl. ¶ 4.  On August 13, 2012, Campbell, Andersen, and three other individuals – Keegan Kuhn ("Kuhn"), Joseph Cuviello ("Cuviello"), and Mark Ennis – traveled to San Jose to film that process.  Campbell Decl. ¶ 5; Andersen Decl. ¶¶ 4-5.  While waiting near the Arena, the group realized that the animals might be arriving by a different route.  Campbell Decl. ¶ 7; Andersen Decl. ¶ 6.

As circus trucks left the Arena, Campbell and Kuhn got into Campbell's car and drove after them.  Campbell Decl. ¶¶ 7-8.  Campbell followed the trucks onto Highway 880 toward Milpitas and communicated her route to Andersen and Cuviello via cellular telephone.  *Id.* ¶ 8.  Andersen and Cuviello got into Andersen's car and, following directions received from Campbell, also drove toward Milpitas.  Andersen Decl. ¶ 7.  The trucks went to the train depot in Milpitas.  Campbell Decl. ¶ 9.  Campbell parked, got out, and began filming the unloading of elephants from a train.  *Id.*  Andersen arrived after Campbell, got out of her car and also started filming.  Andersen Decl. ¶ 8.

**Milpitas Police Officers Dispatched to Train Depot**

Milpitas Police Department ("MPD") records show that earlier that day, at 11:14 a.m., the Department received a call from Ringling advising that the circus would be unloading elephants in Milpitas for transportation to San Jose via trucks, that animal rights activists usually show up to "protest and cause problems," and that Ringling would call back if the activists did show up and

---

[1] The background facts are undisputed unless otherwise noted.

[2] The venue is referred to as both the "San Jose Arena" and "HP Pavilion" in the briefing.  For simplicity's sake, the Court refers to it as the "Arena."

United States District Court
Northern District of California

United States District Court
Northern District of California

1   were "problematic."  Event Detail Log, Danforth Decl. ISO Defs.' Mot. ("Danforth Decl.") Exh.

2   A, ECF 37-2.[3]  At 3:52 p.m. that afternoon, MPD received a call from a reporting party ("RP")

3   who stated that "the circus is loading animals at the train tracks, and there are 6 protesters giving

4   the crew a hard time."  *Id.*  The records reflect that "RP says that they were trying to run the crew

5   off the road when they were driving to the train."  *Id.*

6         At 3:56 p.m., MPD officers were dispatched to the train depot.  Solis Narrative Report at 1,

7   Danforth Decl. Exh. A.[4]  Sergeant Gordon arrived first at approximately 4:05 p.m., at which time

8   Ringling security officer David Bailey ("Bailey") approached and identified himself as the person

9   who had called the police.  *Id.*; Gordon Dep. 13:18-15:17, Danforth Decl. Exh. C.  Gordon

10  testified at his deposition that Bailey told him the following facts:  the drivers of two circus trucks

11  wanted to prosecute two individuals for driving recklessly and swerving in front of the trucks

12  while the trucks were *en route* from San Jose to Milpitas, Gordon Dep. 16:7-16; the reckless

13  driving occurred on Highway 880 between San Jose and Milpitas, *id.* 31:14-18; Bailey himself did

14  not witness the alleged reckless driving but he was relaying what the truck drivers had told him,

15  *id.* 46:23-47:3; and the truck drivers had left to deliver animals to San Jose but would be returning

16  to the Milpitas train depot[5] *id.* 19:19-20:12.  Gordon also testified that Bailey pointed out the two

17  cars involved in the incident, a Honda Accord and a Honda Pilot.  *Id.* 29:5-14.

18         Officer Lee arrived at the train depot shortly after Gordon, at approximately 4:11 p.m.

19  Solis Narrative Report at 1; Lee Dep. 22:11-21, Danforth Decl. Exh. D.  Lee spoke to Gordon and

20

21  [3] Plaintiffs have not objected to the Event Detail Log and in fact they cite to the log in their
    opposition to Defendants' motion.  *See* Pls.' Opp. to MSJ at 8 n.5.  On summary judgment, the
22  Court must consider evidence presented to it, even if it is hearsay, if the opposing party fails to
    object.  *See Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1094 (9th Cir. 1990) ("For purposes of
23  summary judgment, the court had to consider the testimony, even if it was hearsay, because [the
    opposing party] failed to object."); *Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d
24  648, 651-52 & n.2 (9th Cir. 1988) (for purposes of summary judgment, an objection to allegedly
    defective evidence is waived if not raised).

25  [4] Plaintiffs have not objected to the police report, which includes the narrative reports of Solis and
26  Lee; in fact, Plaintiffs themselves cite to the report repeatedly in their opposition to Defendants'
    motion.  *See* Pls.' Opp. to MSJ at 9-12.  Absent objection, the Court must consider the report even
27  if it is hearsay.  *See Skillsky*, 893 F.2d at 1094; *Fireguard*, 864 F.2d at 651-52 & n.2.

28  [5] Conflicting evidence that the truck drivers had not yet left for San Jose is discussed below under
    the heading, "Truck Drivers' Story."

1   then to Bailey.  Lee Dep. 23:24-25:1.  Lee testified that Bailey informed him that:  two circus

2   truck drivers had told him (Bailey) that two cars were driving recklessly on the freeway and trying

3   to run the trucks off the road, *id.* 25:2-8; the truck drivers wanted to prosecute the car drivers for

4   reckless driving, *id.* 29:16-17; and the truck drivers were returning to Milpitas after dropping off

5   circus animals in San Jose, *id.* 39:9-19.  Lee also testified that Bailey pointed out the two cars

6   involved, and pointed out two women – later identified as Campbell and Andersen – as the

7   drivers.  *Id.* 29:22-30:21.

8        Officer Solis arrived on the scene at 4:25 p.m. and shortly thereafter spoke to Gordon, who

9   passed on what Bailey had said about reckless driving.  Solis Narrative Report at 1; Solis Dep.

10  11:4-5, 19:20-22, 23:7-19, Danforth Decl. Exh. K.

11       **Detention and Identification of Plaintiffs**

12       Lee approached Campbell and Andersen and informed them that they were being detained

13  in connection with allegations of reckless driving.  Lee Narrative Report at 2; Campbell Decl. ¶¶

14  12-13; Andersen Decl. ¶¶ 12-13.  Lee obtained Campbell's driver's license and ran a radio check

15  of it at 4:29 p.m.; he did not return the license to Campbell at that time.  Lee Dep. 48:6-25; Lee

16  Narrative Report at 1-2; Campbell Decl. ¶ 12.  Andersen refused to give Lee her identification.

17  Lee Dep. 59:22-60:5; Lee Narrative Report at 2.  Solis identified Andersen by having MPD

18  dispatch run the license plates of the two cars that had been identified by Bailey, a Honda Pilot

19  and a Honda Accord.  Solis Narrative Report at 2-3; Solis Dep. 28:19-29:3.  The Pilot was

20  registered to Sherisa Andersen and David Black and the Accord was registered to Shannon

21  Campbell.  Solis Narrative Report at 2-3.  MPD dispatch obtained Andersen's driver's license

22  photograph and provided it to Solis, who matched the photo to Andersen.  *Id.* at 3.

23       It is unclear from the record precisely when the detention of Plaintiffs commenced.

24  Campbell and Andersen state in their declarations that Lee detained them at approximately 4:20

25  p.m.  Campbell Decl. ¶¶ 10-12; Andersen Decl. ¶¶ 10-12.  That is consistent with Solis's

26  deposition testimony, which indicates that Plaintiffs already had been detained when he arrived on

27  the scene at 4:25 p.m.  Solis Dep. 11:1-4, 23:7-19.  However, Lee testified at his deposition that he

28  ran a radio check of Campbell's license at 4:29 p.m., indicating that the detention may have

United States District Court
Northern District of California

4

1    commenced later than 4:20 p.m.  Lee Dep. 33:8-34:7.  Thus while the evidence shows that Lee

2    first approached Plaintiffs at some point between 4:20 p.m. and 4:29 p.m., it is disputed precisely

3    when he first detained them.

4            **Determination that CHP had Primary Jurisdiction**

5            When describing the alleged reckless driving, Bailey stated that the incident had occurred

6    on Highway 880.  Gordon Dep. 35:11-20.  Gordon told Bailey that the incident was within the

7    jurisdiction of the California Highway Patrol ("CHP") and advised Bailey to call CHP.  *Id.* 36:3-7;

8    Solis Narrative Report at 1.  Bailey called CHP at 4:30 p.m.  Solis Narrative Report at 2.  Solis

9    followed up with CHP dispatch, which confirmed that CHP had received Bailey's call.  Solis

10   Narrative Report at 2.  The Officer Defendants then went into a "holding pattern, waiting for the

11   proper jurisdiction to arrive, the Highway Patrol, and for the victims to return to find out what

12   actually happened."  Gordon Dep. 51:6-10.

13           **Waiting for CHP**

14           CHP's dispatch center advised CHP Officer Andrew Lamar ("Lamar") of the call

15   sometime between 4:36 p.m. and 4:40 p.m.  Lamar Dep. 40:23-25 (4:36 p.m.), 42:12 (4:38 p.m.),

16   49:6-7 (4:40 p.m.).  The call was for reckless driving activity, specifically, trying to run semi-

17   trucks off the road.  *Id.* 12:12-15.  Lamar testified at his deposition that he was delayed in

18   responding, possibly because he was investigating a traffic collision, *id.* 34:7-12, and/or

19   encountered heavy traffic, *id.* 43:16-22.  When Lamar was *en route* to the incident, he called his

20   supervisor, Sergeant Walling ("Walling").  *Id.* 21:16-18.  Walling indicated that he would respond

21   to the call as well.  *Id.*

22           Campbell and Andersen were not cuffed, patted down, or physically restrained during the

23   wait for CHP.  Solis Narrative Report at 3.  They walked around, filmed the officers and circus

24   staff,[6] and made and received calls on their cellular telephones.  *Id.*  Their companions, Kuhn and

25   Cuviello, were not detained.  Kuhn Dep. 96:5, Danforth Decl. Exh. H; Cuviello Dep. 68:1-11,

26   Danforth Decl. Exh. J.  Campbell gave Kuhn her car keys with directions to go to the Arena to

27   _____

28   [6] The Court has reviewed the video taken by Campbell, Andersen, and Cuviello.  *See* Leigh Decl.
     Exhs. H, I, ECF 43.

United States District Court
Northern District of California

1   film the animals being unloaded, which he did.  Kuhn Dep. 97:1-4.  Cuviello stayed with

2   Campbell and Andersen and filmed their detention.  Cuviello Dep. 63:5-13.  Deniz Bolbol,

3   another activist, was present and filmed some of Plaintiffs' detention, but then she went to San

4   Jose to videotape the animals being unloaded there.  Bolbol Dep.48:6-24.

5          During this period, two circus employees walked by and identified Andersen as an

6   individual who had assaulted them in Oakland, California two days earlier.  Solis Narrative Report

7   at 4; Solis Dep. 13-69:9.  The circus employees, Carla Voigt ("Voigt") and Widny Neves

8   ("Neves"), stated that they had reported the assaults to the Oakland Police Department but at that

9   time did not know Andersen's identity.  Solis Narrative Report at 4; Solis Dep. 69:11-19.  Voigt

10  and Neves asked the MPD officers to arrest Andersen and they signed a MPD Notice of

11  Complaint requesting prosecution of Andersen for assault and battery.  Solis Narrative Report at 4.

12  Gordon informed the Oakland Police Department that MPD had identified the suspect involved in

13  the previously reported incident and would send along Andersen's information.  *Id.*; Solis Dep.

14  72:6-22.

15          **CHP's Arrival and Termination of Detention**

16          At 5:09 p.m., Lamar arrived at the scene.  Solis Narrative Report at 4; Solis Dep. 73:15-21;

17  Lamar Dep. 43:4-15.  He spoke with a MPD officer (his testimony does not indicate which

18  officer).  Lamar Dep. 13:22-24.  Lamar's recollection is that the MPD officer stated that Plaintiffs

19  possibly had tried to run semi-trucks off the road to prevent them from getting to the San Jose

20  circus.  *Id.* 13:25-4.  The MPD officer also gave Lamar two field identification cards that included

21  basic information about Plaintiffs.  Solis Narrative Report at 5; Lamar Dep. 21:19-24.  After

22  Lamar had obtained all relevant information from the MPD officers, he started to walk over to

23  Plaintiffs to get their story.  *Id.* 14:13-18.  However, at that moment Lamar's sergeant, Walling,

24  arrived and Lamar instead walked over to speak with him.  *Id.*

25          Walling arrived at 5:38 p.m.  Solis Narrative Report at 5; Lamar Dep. 45:9-12.  Walling

26  spoke with Lamar, Bailey, and the MPD officers.  Solis Narrative report at 5; Lamar Dep. 14:25-

27  15:19.  Walling also requested that the truck drivers return to the scene for questioning.  Lamar

28  Dep. 17:21-25.  At some point, Bailey indicated that he no longer wished to pursue prosecution.

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    Solis Narrative Report at 5; Lamar Dep. 18:10-13, 22:21-22, 37:1-2.  Once Bailey decided not to

2    pursue prosecution, Walling concluded that there was no need to wait for the truck drivers and that

3    Plaintiffs should be released.  Solis Dep. 78:15-79:15.  Lamar and Gordon both told Plaintiffs that

4    they were free to go.  Lamar Dep. 26:22-24; Gordon Dep. 38:2-6.  At Gordon's direction, Lee

5    returned Campbell's driver's license to her.  Lee Narrative Report at 2.  Plaintiffs were released at

6    approximately 5:45 p.m.  Solis Narrative Report at 5.

7            **Truck Drivers' Story**

8            One of the factual disputes between the parties is whether any of the Officer Defendants

9    spoke with the circus truck drivers, Bret McClary ("McClary") and Dan Mast ("Mast"), before

10   McClary and Mast left the Milpitas train depot with their first loads of animals bound for San

11   Jose.  The police report and the officers' testimony suggest that McClary and Mast already had left

12   the train depot by the time Gordon, Lee, and Solis arrived.  *See, e.g.*, Solis Narrative Report at 2;

13   Gordon Dep. 19:19-20:12; Lee Dep. 39:9-19, 77:21-78:13.  However, Plaintiffs assert that

14   McClary spoke to Gordon, Lee, or Solis *before* leaving the train depot.  McClary testified at his

15   deposition that MPD officers were at the train depot for about ten minutes before he left to make

16   his first delivery of animals to San Jose, and he remembers speaking briefly with a MPD officer at

17   that time.  McClary Dep. 55:6-19, 58:23-59:3, Danforth Decl. Exh. B.  McClary testified that he

18   pointed out a Honda to the officer but then told the officer that he had to leave to take a load of

19   animals to San Jose.  *Id.*  McClary told the officer that he would return to the train depot, and the

20   officer indicated that he wanted to get McClary's side of the story.  *Id.* 55:8-56:7.  McClary also

21   remembers seeing a MPD officer speaking with Mast before Mast left for San Jose.  59:13-14.

22           Defendants assert that the scene was "chaotic," with protesters, circus employees, and

23   Animal Control officers present[7] and trucks coming and going.  Defs.' Opp. to MSJ at 4 n. 4, ECF

24   51.  Under those circumstances, Defendants argue, McClary's testimony that he spoke to an

25   "unidentified" officer does not establish that Gordon, Lee, and Solis lied about the truck drivers

26   being gone when they arrived at the train depot.  Defs.' Reply ISO MSJ at 7, ECF 61 ("conflicting

27

28   ─────────────────────────
     [7] It is not clear from the record whether Animal Control officers actually were present.

United States District Court
Northern District of California

1 recollections does not mean that one party or the other is lying"). Defendants of course are correct

2 that McClary's testimony does not establish that Plaintiff's version of events is true. However,

3 one reasonable inference that may be drawn from McClary's testimony is that one or more of the

4 Officer Defendants spoke with the truck drivers before the drivers left the train depot with their

5 first loads of animals. Accordingly, it is disputed whether McClary and Mast were still at the train

6 depot when the Officer Defendants arrived and whether McClary and Mast spoke to one or more

7 of the Officer Defendants at that time.

8      McClary and Mast returned to the train depot at approximately 6:00 p.m. Solis Narrative

9 Report at 5. Although Plaintiffs had been released by then, Solis spoke to McClary for purposes

10 of completing his report. Solis Dep. 84:25-85:25. McClary's story is that while he was driving on

11 Highway 880 behind Mast, a black Honda Civic cut in front of him, slowed down abruptly, and

12 then began swerving in the lane and braking for no apparent reason. Solis Narrative Report at 6;

13 Solis Dep. 81:20-24; McClary Dep. 32:1-34:5. McClary had to apply the brakes very hard in

14 order to avoid rear ending the Honda and he was afraid he was going to run off the road. McClary

15 Dep. 33:21-34:4. He could not identify the driver of the Honda Civic, but he pointed to

16 Campbell's Honda Accord, which was parked nearby. Solis Narrative Report at 6.

17      Lee spoke with Mast, who stated that while driving on Highway 880 he noticed a black

18 Honda sedan following closely behind him, swerving from lane to lane, and cutting in front of

19 McClary's truck, which was behind his truck. Lee Narrative Report at 2; Lee Dep. 77:21-78:13.

20 Mast pointed at Campbell and said she was the driver of the black Honda sedan. Lee Narrative

21 Report at 3; Lee Dep. 78:4-9.

22      Campbell and Andersen remained at the scene for more than thirty minutes after being

23 released and continued filming MPD's activities. Solis Narrative Report at 6; Solis Dep. 90:24-

24 91:23.

25      **This Lawsuit**

26      Plaintiffs filed this lawsuit on August 16, 2013 and they filed the operative first amended

27 complaint ("FAC") on September 19, 2013. The FAC asserts three claims against the Officer

28

1    Defendants and the City:  (1) a § 1983[8] claim for deprivation of First Amendment and Fourth

2    Amendment rights; (2) a claim under California's Bane Act, Cal. Civ. Code § 52.1; and (3) a

3    common law claim for false arrest/false imprisonment.  Defendants seek summary judgment and

4    Plaintiffs seek partial summary judgment.

5    **II.    LEGAL STANDARD RE SUMMARY JUDGMENT**

6        "A party is entitled to summary judgment if the 'movant shows that there is no genuine

7    dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of*

8    *Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ.

9    P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue

10   of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

11   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Where the non-moving party bears the burden of

12   proof at trial, the moving party need only prove that there is an absence of evidence to support the

13   non-moving party's case."  *Id.* "Where the moving party meets that burden, the burden then shifts

14   to the non-moving party to designate specific facts demonstrating the existence of genuine issues

15   for trial."  *Id.*  "[T]he non-moving party must come forth with evidence from which a jury could

16   reasonably render a verdict in the non-moving party's favor."  *Id.*  "The court must view the

17   evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the

18   nonmovant's favor."  *City of Pomona*, 750 F.3d at 1049.  "'Where the record taken as a whole

19   could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for

20   trial.'"  *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

21   (1986)).

22   **III.   DISCUSSION**

23       **A.    Claim 1 – § 1983**

24       Claim 1 is a § 1983 claim against the Officer Defendants and the City for deprivation of

25   Plaintiffs' First Amendment and Fourth Amendment rights.  Plaintiffs allege that Defendants

26   deprived Plaintiffs of the rights to be free from:  (a) unreasonable searches and seizures as secured

27

28   _____

[8] 42 U.S.C. § 1983.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    by the Fourth Amendment; (b) wrongful arrest, detention, and imprisonment as secured by the

2    Fourth Amendment; (c) interference with, or retaliation for, the exercise of constitutionally

3    protected rights including speech, association, conscience, and beliefs, as secured by the First and

4    Fourteenth Amendments; and (d) malicious prosecution as secured by the First, Fourth, and

5    Fourteenth Amendments.  FAC ¶ 67.[9]

6         The Officer Defendants move for summary judgment on Claim 1 on the grounds that they

7    are entitled to qualified immunity and, alternatively, that they did not violate Plaintiffs'

8    constitutional rights.  While Plaintiffs oppose the Officer Defendants' motion with respect to both

9    First Amendment and Fourth Amendment claims, Plaintiffs themselves move for summary

10   judgment on Claim 1 only as to their Fourth Amendment claims.

11        The City moves for summary judgment on Claim 1, asserting that the Officer Defendants

12   did not commit any constitutional violation and that Plaintiffs cannot establish that any such

13   violation was pursuant to an established policy of the City or was ratified by the City.  Plaintiffs

14   do not seek summary judgment against the City on Claim 1.

15                    **1.    Legal Standard Re Qualified Immunity**

16        A government official sued under § 1983 is entitled to qualified immunity unless the

17   plaintiff shows that (1) the official violated a statutory or constitutional right, and (2) the right was

18   "clearly established" at the time of the challenged conduct.  *Plumhoff v. Rickard*, 134 S. Ct. 2012,

19   2023 (2014) (citing *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2080 (2011)).  Until recently, courts

20   were required to determine application of the doctrine using the two-step sequence mandated by

21   the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, a court was to determine

22   whether the plaintiff had demonstrated a violation of a constitutional right.  *Saucier*, 533 U.S. at

23   201.  Second, if the first step was satisfied, the court was to determine whether the right at issue

24   was "clearly established" at the time of the defendant's alleged misconduct.  *Id.*

25

26   [9] Although there is no allegation of excessive force in the body of the FAC, the heading of Claim
     1 indicates that the Fourth Amendment claim encompasses a claim of excessive force.
27   Defendants' motion for summary judgment points out that there is no evidence of excessive force,
     and none of Plaintiffs' briefing opposing Defendants' motion or in support of their own motion
28   even mentions excessive force.  Accordingly, the Court concludes that the reference to excessive
     force in the Claim 1 heading was in error or that Plaintiffs have abandoned that claim.

In *Pearson v. Callahan*, the Supreme Court revisited *Saucier*, observing that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In those cases, unnecessary litigation of constitutional issues wastes the parties' resources.  *Id.* at 237.  The Supreme Court modified its *Saucier* decision, concluding that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236.  Thus after *Pearson*, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* The Supreme Court has reaffirmed *Pearson* in subsequent decisions, stating that "[t]his approach comports with our usual reluctance to decide constitutional questions unnecessarily." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also al-Kidd*, 131 S. Ct. at 2080 ("Courts should think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case.") (internal quotation marks and citation omitted).

When addressing the "clearly established" prong, a court may not define the constitutional right at a high level of generality, because "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023.  "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*  "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2083-34).  "A right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013).  "The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional." *Id.*

United States District Court
Northern District of California

### 2.    First Amendment (Defendants' Motion)

Plaintiffs identify the relevant First Amendment rights only at the highest level of generality in the FAC, alleging that Plaintiffs were deprived of their rights of "speech, association, conscience, and beliefs," and their "right to be free from malicious prosecution."  FAC ¶ 67. Plaintiffs' briefing provides more detail regarding their First Amendment claim, asserting that the Officer Defendants had an "ill motive" for detaining them, specifically, retaliation for prior protest activities or an intent to chill future protest activities.  Pls.' Opp. to MSJ at 13-14, ECF 52.

Plaintiffs' First Amendment claim cannot be resolved under the "clearly established" prong of the qualified immunity inquiry.  To the contrary, "[p]olice officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech."  *Ford*, 706 F.3d at 1195.  In 2006, a panel of the Ninth Circuit held that the existence of probable cause for a seizure does not preclude a First Amendment claim that the seizure was retaliatory.  *See Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006).[10] Although the present case involves an investigative stop for which there was reasonable suspicion[11] rather than a seizure for which there was probable cause, the rationale of *Skoog* clearly would apply.  Based upon *Skoog* and numerous other cases establishing that a deprivation of First Amendment rights occurs when an officer deters or chills political speech, *see, e.g., Mendocino Environ. Center v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (a deprivation of First Amendment rights occurs when an officer deters or chills political speech and such deterrence or chilling was a substantial or motivating factor in the officer's conduct), the Officer Defendants had "fair warning" that conducting an investigative stop in retaliation for, or to chill, protest activities would violate the First Amendment despite the existence of reasonable suspicion.  Thus in order to

---

[10]  Another court in this district has recognized the tension between *Skoog,* the Supreme Court's decision in *Reichle*, and a later panel decision of the Ninth Circuit, *Acosta v. City of Costa Mesa*, 718 F.3d 800 (2013).  *See Morse v. San Francisco Bay Area Rapid Transit District*, Case No. 12-cv-5289 JSC, 2014 WL 572352, at *12-13 (N.D. Cal. Feb. 11, 2014).  For the reasons discussed in *Morse*, this Court agrees that neither *Reichle* nor *Acosta* undermines the holding of *Skoog*.  In any event, as discussed below, the Officer Defendants are entitled to qualified immunity based upon the absence of evidence in the record that they detained Plaintiffs for a retaliatory purpose or to chill Plaintiffs' protected speech.

[11] The evidence establishing reasonable suspicion is discussed below in section A.3.a.

establish the existence of qualified immunity with respect to Plaintiffs' First Amendment claim, the Officer Defendants must demonstrate that they did not violate Plaintiffs' constitutional rights.

As discussed above, the constitutional violation asserted here is retaliation in violation of the First Amendment.  In order to prevail upon that claim, Plaintiffs must prove that the Officer Defendants' conduct "would chill a person of ordinary firmness from future First Amendment activity."  *Ford*, 706 F.3d at 1193.  Additionally, Plaintiffs must prove that the Officer Defendants' desire to chill their speech was "a but-for cause" of the allegedly unlawful conduct.  *Id.*

Defendants point to an absence of evidence in the record from which a reasonable trier of fact could find that a retaliatory animus was a "but-for cause" of Plaintiffs' detention.  Where, as here, the nonmoving party bears the burden of proof at trial, the moving party may meet its burden on summary judgment by demonstrating that there is an absence of evidence to support the nonmoving party's case.  *Oracle*, 627 F.3d at 387.  It is undisputed that:  the Officer Defendants were dispatched to the Milpitas train depot based upon a report of reckless driving, *see* Event Detail Log; upon arrival at the train depot the Officer Defendants were met by Bailey, who identified Plaintiffs as the alleged reckless drivers, *see* Gordon Dep. 16:7-16; Lee Dep. 29:14-30:21; the Officer Defendants quickly determined that the alleged reckless driving had occurred on the highway and thus that CHP had primary jurisdiction, *see* Gordon Dep. 35:11-20, 36:3-7; Solis Narrative Report at 1; and the Officer Defendants detained Plaintiffs pending arrival of CHP, *see* Gordon Dep. 51:6-10.  Nothing in this chronology of events suggests an improper motive for the detention.  Plaintiffs were not precluded from filming the officers and circus personnel throughout the detention.  Solis Narrative Report at 3.  Plaintiffs' companions were not detained, and in fact Campbell gave Kuhn her car keys with directions to go to the Arena to film the animals being unloaded, which he did.  Kuhn Dep. 97:1-4.  Accordingly, Defendants have met their initial burden on summary judgment.

Because Defendants have established an absence of evidence to support Plaintiffs' First Amendment claim, the burden shifts to Plaintiffs "to designate specific facts demonstrating the existence of genuine issues for trial."  *Oracle*, 627 F.3d at 387.  "This burden is not a light one."

United States District Court
Northern District of California

*Id.* Plaintiffs "must show more than the mere existence of a scintilla of evidence," and they "must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *Id.* Plaintiffs must come forth with evidence from which a jury could reasonably render a verdict in their favor on the First Amendment claim. *See id.*

Plaintiffs' brief in opposition to the Officer Defendants' motion states that "there is ample evidence upon which a jury could reasonably find the requisite ill motive." Pls.' Opp. to MSJ at 14, ECF 52. However, the brief does not cite any documents, declarations, deposition testimony or other evidence in support of that statement. *See id.* Rather than directing the Court to evidence, Plaintiffs' brief lists a number purported "facts": (1) "the officers' false assertions that the truck drivers were not present"; (2) "the officers' false claim to have not spoken to McClary and Mast before detaining Plaintiffs"; (3) "the officers' detention of Plaintiffs, knowing that the truck drivers the CHP would need to speak [sic] would not be present"; and (4) "the officers' decision to ask Bailey to call the CHP rather than contacting the CHP themselves – a tactic that could only serve to delay the CHP's arrival and prolong Plaintiffs' detention." *Id.* Plaintiffs do not explain (and the Court is at a loss to understand) how those purported "facts" give rise to a reasonable inference that the Officer Defendants detained Plaintiffs because of a retaliatory animus.

In other portions of their brief, Plaintiffs assert that the Officer Defendants knew early in the day and were informed at the train depot that Plaintiffs were engaged in free speech activities. *See* Pls.' Opp. to MSJ at 8. The record contains evidence that Ringling called MPD on the morning of the day in question to advise that animal rights protesters might create problems at the train depot, *see* Event Detail Log, and that at the time of the detention Cuviello told the Officer Defendants that detaining Plaintiffs would prevent them from videotaping the circus animals, Cuviello Decl. ¶ 16. Even assuming that the Officer Defendants knew about the morning call (which is not clear from the record) and understood that Plaintiffs wished to engage in further videotaping of the circus animals, that knowledge alone does not give rise to a reasonable inference that the Officer Defendants had a retaliatory animus. In other words, the mere fact that the Officer Defendants *knew* that Plaintiffs were protesters does not give rise to a reasonable inference that the Officer Defendants detained Plaintiffs *because* they were protesters.

United States District Court
Northern District of California

1    To the extent that Plaintiffs argue that the detention violated their First Amendment rights

2    even absent a retaliatory animus, *see* Pls.' Opp. to MSJ at 14, Plaintiffs do not identify, and the

3    Court has not discovered, any authority for the proposition that a non-retaliatory detention for a

4    crime unrelated to speech violates the First Amendment simply because the detainee tells the

5    officer that the detention will interfere with that day's planned protest activities.

6    Based upon this record, and even drawing all reasonable inferences in Plaintiffs' favor, no

7    rational jury could find for nonmoving parties Campbell and Andersen.  *See Anderson v. Liberty*

8    *Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Accordingly, because the Officer Defendants have

9    demonstrated an absence of evidence in the record to support a claim that they violated Plaintiffs'

10   clearly established First Amendment rights, and Plaintiffs have failed to show the existence of a

11   triable issue of material fact that is supported by the evidence, the Officer Defendants are entitled

12   to qualified immunity on Plaintiffs' First Amendment claim.  The Officer Defendants' motion for

13   summary judgment is GRANTED on Claim 1 as to the alleged violation of the First Amendment.

14   **3.    Fourth Amendment (Cross-Motions)**

15   Plaintiffs identify the relevant Fourth Amendment rights only at the highest level of

16   generality in the FAC, alleging that Plaintiffs were deprived of their rights to be free from

17   "unreasonable searches and seizures" and "wrongful arrest, detention, and imprisonment."  FAC ¶

18   67.  As noted above, defining the constitutional right in this manner "avoids the crucial question

19   whether the official acted reasonably in the particular circumstances that he or she faced."

20   *Plumhoff*, 134 S. Ct. at 2023.  Plaintiffs' briefs provide more detail as to their theories, indicating

21   that they challenge both the existence of reasonable suspicion for the initial *Terry*[12] stop and the

22   detention itself.  With respect to the detention, Plaintiffs claim that the Officer Defendants held

23   them for such an unreasonably long period of time that the detention became a *de facto* arrest

24   without probable cause.  Plaintiffs assert that the Officer Defendants' explanation that they were

25   maintaining the status quo pending arrival of the agency with primary jurisdiction – CHP – is not

26

27   _____

28   [12] *Terry v. Ohio*, 392 U.S. 1 (1968).

1  supported by the law.[13]

2    ### a.    Initial Investigative Stop

3    Plaintiffs' challenge to the initial *Terry* stop easily is disposed of under both the

4  "constitutional violation" and the "clearly established" prongs.  It long has been established that

5  "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person

6  they encounter was involved in or is wanted in connection with a completed felony, then a *Terry*

7  stop may be made to investigate that suspicion."  *United States v. Hensley*, 469 U.S. 221, 229

8  (1985).  For purposes of qualified immunity, whether a reasonable officer could have believed

9  reasonable suspicion existed is "essentially a legal question."  *Act Up!/Portland v. Bagley*, 988

10  F.2d 868, 873 (9th Cir. 1993).  "Where the underlying facts are undisputed, a district court must

11  determine the issue on motion for summary judgment."  *Id.*

12    In 2007, the Ninth Circuit held that in appropriate circumstances an investigative stop may

13  be made in connection with a completed misdemeanor.  *United States v. Grigg*, 498 F.3d 1070,

14  1081 (9th Cir. 2007).  The court stated that "[w]e adopt the rule that a reviewing court must

15  consider the nature of the misdemeanor offense in question, with particular attention to the

16  potential for ongoing or repeated danger (*e.g.*, drunken and/or reckless driving), and any risk of

17  escalation (*e.g.*, disorderly conduct, assault, domestic violence).  *Id.*

18    In the present case, the misdemeanor[14] in question was reckless driving.  It is undisputed

19  that the Officer Defendants were dispatched based upon a report that protesters were trying to run

20  circus trucks off the road.  Event Detail Log.  It likewise is undisputed that when the Officer

21

---

22  [13] Plaintiffs also claim that the weather was warm and that they were not permitted to have water.
*See* Pls.' Opp. to MSJ at 8.  However, the evidence they cite in support of that argument shows

23  only that Andersen's *request to go to her car* to get water was denied.  *See* Andersen Decl. ¶ 14.
Cuviello, who was not detained, did go to the car to get a bottle of water.  *See* Danforth Reply.

24  Decl. ¶ 4 & Exh. B.

25  [14] Defendants dispute the characterization of Plaintiffs' reckless driving as a completed
misdemeanor, asserting that Plaintiffs' conduct could have been charged as the felony of "Road

26  Rage – Assault With a Deadly Weapon."  Defs.' Opp. to MSJ at 8-9, ECF 51.  However,
Defendants do not point to any evidence suggesting that the Officer Defendants believed that they

27  might be dealing with a felony rather than a misdemeanor.  The first CHP responder, Lamar,
understood that the call related to a violation of California Vehicle Code § 23103, reckless driving,

28  which is a misdemeanor.  Lamar Dep. 26:6-13.

United States District Court
Northern District of California

1   Defendants arrived at the train depot, Bailey told them that two cars had driven recklessly near,

2   and swerved in front of, circus trucks on Highway 880.  Gordon Dep. 16:7-16; Lee Dep. 25:2-8,

3   29:14-30:21.  Bailey identified two cars parked nearby as involved in the incident, and identified

4   Plaintiffs as the drivers.  *Id.*  Accepting Plaintiffs' version of events,[15] one of the Officer

5   Defendants also talked to McClary, who pointed out a Honda that was involved in the incident.

6   McClary Dep. 55:6-19.  Within a short period after the Officer Defendants arrived, circus trucks

7   left the train depot to deliver animals to San Jose.  *Id.* 28:15-22.  Plaintiffs were walking to their

8   cars when they were detained.  Campbell Decl. ¶¶ 10-11; Andersen Decl. ¶¶ 10-11.  Based upon

9   these undisputed facts, the Court has no difficulty in concluding that the officers had reasonable

10  suspicion based on specific and articulable facts and thus the *Terry* stop did not amount to a

11  constitutional violation.

12          Relying on a number of cases addressing the use of informant's tips to establish probable

13  cause for search warrants, Plaintiffs argue that the Officer Defendants lacked a basis for

14  reasonable suspicion because they knew Bailey was biased and that he had only second hand

15  knowledge regarding the alleged reckless driving.  Pls.' MSJ at 11-12, ECF 45.  The cited cases

16  offer little guidance here given that "[r]easonable suspicion is a less demanding standard than

17  probable cause not only in the sense that reasonable suspicion can be established with information

18  that is different in quantity or content than that required to establish probable cause, but also in the

19  sense that reasonable suspicion can arise from information that is less reliable than that required to

20  show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990).  Moreover, under Plaintiffs'

21  own version of events one of the Officer Defendants corroborated Bailey's reckless driving report

22  by speaking with McClary before McClary left for San Jose.  *See* McClary Dep. 55:6-19.

23  Accordingly, Plaintiffs' arguments do not undermine the Court's conclusion that there was no

24

25  [15] The Court must determine whether any party is entitled to judgment even if all reasonable
    inferences are drawn in favor of the nonmoving parties.  The Court has determined that the Officer
26  Defendants are entitled to summary judgment on the § 1983 claim.  Thus the Court must draw all
    reasonable inferences in Plaintiffs' favor with respect to that claim. *See City of Pomona v. SQM*
27  *North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).  Plaintiffs assert that one of the
    Officer Defendants spoke to McClary and Mast before they left the train depot.  *See* Pls.' MSJ at
28  16 n.7; Pls.' Opp at 11-12.  Because that is one reasonable inference that may be drawn from the
    evidence, the Court must accept Plaintiffs' version of events when considering the § 1983 claim.

United States District Court
Northern District of California

constitutional violation arising from the stop.

Moreover, Plaintiffs have not identified, and the Court has not discovered, any cases that would have informed a reasonable officer in the circumstances of this case that this investigative stop was unlawful.  To the contrary, given that in *Grigg* the Ninth Circuit expressly approved a *Terry* stop in circumstances like this – a completed misdemeanor of reckless driving outside the presence of the officer – a reasonable officer in Defendants' shoes reasonably could have believed that the initial investigative stop was lawful.  Accordingly, the Officer Defendants are entitled to qualified immunity under the "clearly established" prong as well as the "constitutional violation" prong of the qualified immunity analysis.

### b.    Detention

Plaintiffs argue that even if the initial stop was valid, the detention became an unlawful arrest without probable cause due to the length of time that they were detained.  Plaintiffs contend that the Officer Defendants' explanation that they went into a "holding pattern" pending arrival of the agency with primary jurisdiction (CHP) is not supported by the law.

This case clearly falls within those cases the Supreme Court has recognized as appropriate to decide without resolving the underlying constitutional claim.  *See Reichle*, 132 S. Ct. at 2093.  Thus although it necessarily reaches the constitutional issue in the context of Plaintiffs' false arrest claim, addressed below, this Court begins its qualified immunity analysis with the "clearly established" prong.  Unfortunately, neither side defines the right at issue with the level of specificity required by the case law.  It is insufficient for Plaintiffs to assert merely that their right to be free of "wrongful arrest, detention, and imprisonment" was violated, *see* FAC ¶ 67, because that definition would not put the Officer Defendants on notice that their conduct in this case was unlawful.  *See Plumhoff*, 134 S. Ct. at 2023 (defining constitutional right at a high level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.").  Accordingly, the Court must attempt to discern what "clearly established" right Plaintiffs contend was violated.

An individual has the right under the Fourth Amendment to be free from an investigative stop unless it is justified at its inception by reasonable suspicion and brief in its duration consistent

18

United States District Court
Northern District of California

1    with the scope and circumstances at hand – here, a completed misdemeanor.  *See United States v.*

2    *Sharpe*, 470 U.S. 675, 682 (1985).  Under the second prong of the qualified immunity analysis, the

3    Court must determine whether it was clearly established in 2012, such that a reasonable officer

4    would have known, that it was unlawful for an officer to go into a "holding pattern" during an

5    investigative detention while waiting for the agency with primary jurisdiction to arrive to continue

6    the investigation.

7           Neither side has briefed the "clearly established" prong satisfactorily.  The Officer

8    Defendants assert in a footnote that "[i]t is not the least bit unusual or unreasonable for a law

9    enforcement agency to detain a suspect while the agency with primary jurisdiction and/or the

10   agency with the means to effectuate a more thorough investigation can get to the scene."  Defs.'

11   MSJ at 9 n.8.  They support that assertion with citation to a number of cases in which lengthy

12   detentions were deemed reasonable when the detaining officer was waiting for drug sniffing dogs

13   to arrive at the scene.  *See United States v. Villa-Chaparro*, 115 F.3d 797 (10th Cir. 1997) (forty-

14   three minutes); *United States v. Maltais*, 295 F. Supp. 2d 1077 (D.N.D. 2003) (three hours);

15   *United States v. Hbaiu*, 202 F. Supp. 2d 1177 (D. Kan. 2002) (one hour forty-five minutes).

16   While those cases are factually distinguishable from the present case, they do approve lengthy

17   detentions pending arrival of another agency or investigator with superior expertise, and they

18   suggest that a detention of the length at issue here may be appropriate in some circumstances.

19          Plaintiffs do not address the "clearly established" prong at all.  In fact, the seven-page

20   section of Plaintiffs' opposition brief entitled "The Officer Defendants are not Entitled to

21   Qualified Immunity" does not cite *any* cases whatsoever aside from a footnoted reference to

22   *Florida v. Royer*, 460 U.S. 491 (1983), for the proposition that retention of an individual's driver's

23   license precludes a claim that the detention has terminated.  *See* Pls.' Opp. to MSJ at 7-13.

24          Although beyond dispute that at the time of this incident the law was clearly established

25   that a prolonged seizure without a valid investigative purpose was unreasonable in violation of the

26   Fourth Amendment, it has also been recognized that some investigative stops may be reasonable

27   even if they are longer than momentary.  *Liberal v. Estrada*, 632 F.3d 1064, 1080 (9th Cir. 2011).

28   The question before this Court is whether the law was clearly established to preclude the Officer

United States District Court
Northern District of California

1    Defendants' "holding pattern" while awaiting CHP's arrival.

2         The Court has not discovered any cases directly on point, although in *Sharpe* – arguably

3    the leading Fourth Amendment detention case – the Supreme Court held that it was appropriate for

4    a state highway patrol officer to hold a suspect for fifteen minutes pending arrival of the Drug

5    Enforcement Administration ("DEA") agent with primary authority.  *See Sharpe*, 470 U.S. at 687

6    n.5.  The DEA agent had called for assistance from the highway patrol after observing two

7    vehicles, a car and a truck, driving in tandem in an area under surveillance for drug trafficking.  *Id.*

8    at 677.  The highway patrol officer gave chase to and ultimately detained the truck driver and then

9    held him pending arrival of the DEA agent.  *Id.* at 678.  Recognizing that there is no bright-line

10   test for determining whether a detention has become a *de facto* arrest, the Supreme Court observed

11   that, "[w]hile it is clear that the brevity of the invasion of the individual's Fourth Amendment

12   interests is an important factor in determining whether the seizure is so minimally intrusive as to

13   be justifiable on reasonable suspicion, *we have emphasized the need to consider the law*

14   *enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate*

15   *those purposes.*"  *Id.* at 685 (internal quotation marks and citations omitted) (emphasis added).

16   The Supreme Court found the highway patrol officer's detention of the truck driver pending

17   arrival of the DEA agent to be appropriate in the circumstances given the highway patrol officer's

18   lack of knowledge about the case and lack of training and experience in narcotics investigations.

19   *Id.* at 687 n.5.

20        None of the cases cited by the parties with respect to the "constitutional violation" prong

21   address the authority of a detaining officer to hold a suspect for the agency with primary

22   jurisdiction.  The closest, perhaps, is *United States v. $191,910.00 in U.S. Currency*, in which the

23   Ninth Circuit held that drug task force agents violated the Fourth Amendment when they detained

24   a suspect's airline baggage for two hours while waiting for a drug sniffing dog.  *United States v.*

25   *$191,910.00 in U.S. Currency,* 16 F.3d 1051 (9th Cir. 1994) (*superseded by statute on other*

26   *grounds as stated in United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1183 (9th Cir.

27   2002)).  The Ninth Circuit found that the agents had not acted diligently because they knew earlier

28   in the day what time the suspect's plane was landing and they could have had a dog available at

United States District Court
Northern District of California

1  the airport. *Id.* at 1061.  That case is factually distinguishable, as there is no evidence that the

2  Officer Defendants could have anticipated the need for, and arranged for the earlier arrival of,

3  CHP.  The holding cannot be read to conclude that "it would [have been] clear to a reasonable

4  officer in the [Officer Defendants'] position that [their] conduct was unlawful in the situation

5  [they] confronted." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (internal quotation marks and

6  citation omitted).

7            The Court concludes that the body of law in existence at the time of the 2012 detention

8  would not have informed a reasonable officer in the circumstances of this case that the detention

9  while waiting for CHP to arrive was clearly established as unlawful.  This is especially true under

10  the specific facts of this case where Plaintiffs were not handcuffed or physically restrained.  They

11  were free to walk around, film the officers, make telephone calls, talk to their friends, and allow

12  other protesters to take one of the involved cars to film the unloading of circus animals in San

13  Jose.  There is no evidence that Plaintiffs were threatened, coerced, or berated during the

14  detention.  In this regard the present case is markedly different from *Liberal*, where during the

15  forty-five minute detention the plaintiffs were handcuffed for thirty minutes, berated by the

16  officer, subjected to an illegal car search, and ultimately released without arrest or citation.  *See*

17  *Liberal*, 632 F.3d at 1068-70.  Because the Court is satisfied that the state of the law at the time of

18  the detention would not have given the Officer Defendants "fair warning" that their conduct was

19  unlawful, *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002), they are entitled to qualified immunity on

20  Plaintiffs' Fourth Amendment claim.[16]  The Officer Defendants' motion for summary judgment is

21  GRANTED on Claim 1 as to the alleged violation of the Fourth Amendment and Plaintiffs' cross-

22  motion for partial summary judgment on that claim DENIED.

23

24  _____

25  [16] In light of this disposition, the Court need not reach the Officer Defendants' alternative
argument that Plaintiffs cannot show a violation of their Fourth Amendment rights.  However, the
26  question of whether Plaintiffs can show a Fourth Amendment violation is addressed below in the
context of Plaintiffs' common law claim for false arrest/false imprisonment, which is not subject
27  to the defense of qualified immunity.  *See Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d
1159, 1171 (9th Cir. 2013) ("[T]he doctrine of qualified immunity does not shield defendants from
28  state law claims.").

1

#### 4.   *Monell* (Defendants' Motion)

2      The City seeks summary judgment on Plaintiffs' *Monell*[17] claim, asserting that Plaintiffs

3   cannot establish a deprivation of any constitutional right and have not identified a City policy that

4   gave rise to a deprivation of any constitutional right.   Plaintiffs do not seek summary judgment on

5   their § 1983 claim against the City.

6      "A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy,

7   practice, or custom of the entity can be shown to be a moving force behind a violation of

8   constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing

9   *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).   "In order to establish

10   liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff]

11   possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a

12   policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right;

13   and, (4) that the policy is the moving force behind the constitutional violation.'" *Id.* (quoting

14   *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)) (alterations in

15   original).

16      Alternatively, "[a] municipality may be held liable for a constitutional violation if a final

17   policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).

18   "To show ratification, a plaintiff must show that the authorized policymakers approve a

19   subordinate's decision and the basis for it." *Id.* (internal quotation marks and citation omitted).

20   The policymaker must have actual knowledge of the constitutional violation and affirmatively

21   approve of it – a failure to overrule a subordinate's actions is insufficient to support a § 1983

22   claim. *Id.*

23      The City submits Plaintiffs' responses to interrogatories, in which Plaintiffs identify the

24   official policy or practice that led to the alleged violations of their civil rights, or a policymaker's

25   ratification of conduct that led to the alleged violations, only by repeating the boilerplate

26   allegations of the FAC.   *See* Responses, Danforth Decl. Exh. G.   Because the City has established

27

28   ---
[17] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

1    an absence of evidence to support Plaintiffs' *Monell* claim, the burden shifts to Plaintiffs "to

2    designate specific facts demonstrating the existence of genuine issues for trial." *Oracle*, 627 F.3d

3    at 387.  Plaintiffs' opposition brief does not address the City's motion on the *Monell* claim, nor did

4    Plaintiffs' counsel address it at oral argument.  Accordingly, Plaintiffs have failed to meet their

5    burden.

6          The City's motion for summary judgment on the § 1983 claim is GRANTED.

7          **B.      Claim 2 – Bane Act (Cross-Motions)**

8          In Claim 2, Plaintiffs assert liability against all defendants under the Bane Act, California

9    Civil Code § 52.1(a), based upon Defendants' alleged violations of Plaintiffs' Fourth Amendment

10   rights and their free speech rights under the First Amendment and the California Constitution.[18]

11   FAC ¶ 71.  Defendants move for summary judgment on Claim 2, asserting that Plaintiffs cannot

12   establish either element of a Bane Act claim:  (1) a deprivation of a constitutional or statutory right

13   (2) by use of threats, intimidation, or coercion.  *See* Cal. Civ. Code § 52.1(a).  Plaintiffs also move

14   for summary judgment on Claim 2, asserting that the record evidence establishes liability under

15   the Bane Act.

16         A defendant is liable under the Bane Act "if he or she interfered with or attempted to

17   interfere with the plaintiff's constitutional rights by . . . threats, intimidation, or coercion."

18   *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947, 956 (2012); Cal. Civ. Code § 52.1(a).

19   "The statutory framework of section 52.1 indicates that the Legislature meant the statute to

20   address interference with constitutional rights involving more egregious conduct than mere

21   negligence." *Shoyoye*, 203 Cal. App. 4th at 958.  "The apparent purpose of the statute is not to

22   provide relief for an over-detention brought about by human error rather than intentional conduct."

23   *Id.* at 959.  "[W]here coercion is inherent in the constitutional violation alleged, i.e., an over-

24

25   [18] The FAC identifies additional constitutional violations, including rights to equal protection
26   under the Fourteenth Amendment to the United States Constitution and Article I of the California
     Constitution, and the right to liberty under the California Constitution.  FAC ¶ 71, ECF 7.
27   However, Plaintiffs have not argued those alleged violations in opposition to Defendants' motion
     for summary judgment, and the record is devoid of evidence to support such alleged violations.
28   Accordingly, the Court understands Plaintiffs to have abandoned any Bane Act claims based upon
     those additional alleged constitutional violations.

United States District Court
Northern District of California

1   detention [], the statutory requirement of 'threats, intimidation, or coercion' is not met." *Id.* "The

2   statute requires a showing of coercion independent from the coercion inherent in the wrongful

3   detention itself." *Id.*

4           With respect to Plaintiffs' Bane Act claim based upon alleged violations of their free

5   speech rights under the First Amendment and California Constitution, the Court has determined

6   that there is no evidence in the record from which a rational jury could conclude that the Officer

7   Defendants violated Plaintiffs' free speech rights under the First Amendment.  The parties do not

8   address separately the question of whether the Officer Defendants violated Plaintiffs' free speech

9   rights under the California Constitution.  However, the federal and state free speech rights asserted

10  are "largely coextensive, with California's Liberty of Speech Clause providing broader protections

11  than the First Amendment." *Bolbol v. City of Daly City*, 754 F. Supp. 2d 1095, 1105 (N.D. Cal.

12  2010).  Moreover, in light of the Court's determination that there is no evidence in the record from

13  which a rational jury could conclude that the Officer Defendants acted in retaliation for, or to chill,

14  Plaintiffs' exercise of their free speech rights, Plaintiffs cannot demonstrate a violation of their

15  free speech rights under the California Constitution.  Accordingly, Defendants are entitled to

16  summary judgment with respect to Plaintiffs' Bane Act claim based upon alleged violations of

17  Plaintiffs' free speech rights under the First Amendment and the California Constitution.

18          With respect to Plaintiffs' Bane Act claim based upon alleged violation of their Fourth

19  Amendment rights, the record is devoid of evidence of any coercion apart from the coercion

20  inherent in the detention itself.  *See Shoyoye*, 203 Cal. App. 4th at 959 ("The statute requires a

21  showing of coercion independent from the coercion inherent in the wrongful detention itself.")

22  Plaintiffs do not direct the Court to any evidence of excessive force, *see, e.g., Bender v. Cnty of*

23  *Los Angeles*, 217 Cal. App. 4th 968, 979 (2013), or other additional conduct that could support a

24  Bane Act claim.  Instead, Plaintiffs argue that Defendants err in reading *Shoyoye* to require

25  evidence of coercive conduct in addition to the detention itself, citing *Quezada v. City of Los*

26  *Angeles*, 222 Cal. App. 4th 993 (2014) for the proposition that "an unlawful detention, as in the

27  case *sub judice*, satisfies the coercion necessary for a section 52.1 claim."  Pls.' Reply ISO MSJ at

28  16, ECF 62.  *Quezada* holds precisely the opposite, as it cites *Shoyoye* for the proposition that

United States District Court
Northern District of California

24

1   "[t]he coercion inherent in detention is *insufficient* to show a Bane Act violation." *Quezada*, 222

2   Cal. App. 4th at 1008 (emphasis added).  Accordingly, Defendants are entitled to summary

3   judgment with respect to Plaintiffs' Bane Act claim based upon alleged violations of Plaintiffs'

4   Fourth Amendment rights.

5       Defendants' motion for summary judgment is GRANTED on Claim 2, and Plaintiffs'

6   motion for partial summary judgment is DENIED on Claim 2.

7       **C.    Claim 3 – Common Law False Arrest/False Imprisonment (Cross-Motions)**

8       Claim 3 asserts liability against all Defendants under a common law claim for false

9   arrest/false imprisonment.  "'[F]alse arrest' and 'false imprisonment' are not separate torts.  False

10  arrest is but one way of committing a false imprisonment, and they are distinguishable only in

11  terminology." *Collins v. City and Cnty. of San Francisco*, 50 Cal. App. 3d 671, 673 (1975).

12  "Under California law, the elements of a claim for false imprisonment are:  (1) the nonconsensual,

13  intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period

14  of time, however brief." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011)

15  (internal quotation marks and citation omitted).  It is undisputed that the Officer Defendants

16  confined Plaintiffs (first element) for an appreciable period of time (third element) during the

17  detention at the train depot.  The parties' motions with respect to this claim turn on the second

18  element, whether the confinement was without lawful privilege.

19      As discussed above, the Officer Defendants had reasonable suspicion for the investigative

20  stop.  Thus the initial stop cannot support the false arrest claim.  The subsequent detention is

21  problematic, however, and the Court must determine whether the undisputed facts establish that it

22  was so long as to become a *de facto* arrest for which the Officer Defendants would have needed

23  probable cause under the Fourth Amendment.  The Officer Defendants do not argue, and have not

24  presented evidence of, probable cause for an arrest.  Accordingly, if the detention did last so long

25  as to become a *de facto* arrest, it violated the Fourth Amendment and was "without lawful

26  privilege," establishing false arrest as well.[19]

27

28  ――――――――――――――
[19] The Officer Defendants' qualified immunity defense is not applicable to Plaintiffs' common law
false arrest claim.  *See Johnson*, 724 F.3d at 1171.

United States District Court
Northern District of California

The Supreme Court has recognized that the line of cases addressing investigative stops "create difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest." *Sharpe*, 470 U.S. at 685. "[I]f an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Id.* However, "cases impose no rigid time limitation on *Terry* stops." *Id.* In *Sharpe*, the Supreme Court observed that, "[w]hile it is clear that the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion, we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* (internal quotation marks and citations omitted). When determining whether an investigative stop has become a *de facto* arrest, the Court must consider "all the surrounding circumstances," *United States v. Torres-Sanchez*, 83 F.3d 1123, 1127 (9th Cir. 1996), through the lens of "common sense and ordinary human experience," *Sharpe*, 470 U.S. at 685.

Reviewing Plaintiffs' motion for partial summary judgment on this issue, the Court resolves all disputed facts in favor of the Officer Defendants. Even reduced to its minimum, Plaintiffs' detention lasted forty minutes. That calculation assumes that the detention commenced at 4:29 p.m. when Officer Lee ran a radio check of Campbell's license and terminated at 5:09 p.m. when Lamar arrived. Drawing all reasonable inferences in the Officer Defendants' favor, the Court assumes that responsibility for the detention transferred to CHP immediately upon Lamar's arrival. Not having sued CHP, Plaintiffs cannot be heard to complain about delays in the detention after CHP took command.

It is undisputed that as soon as the Officer Defendants determined that CHP had primary jurisdiction, they went into a "holding pattern" while they waited for CHP to arrive. Gordon Dep. 50:2-51:14. As described above, Plaintiffs were not physically restrained, interviewed, or threatened in any way. They were allowed to walk around the general area, talk to their friends, make telephone calls, videotape the officers, and release one of the involved cars to other protesters. Thus, the sole question presented by Plaintiffs' motion is whether a forty-minute detention was constitutionally unreasonable under the circumstances of this case.

1    As the Ninth Circuit held in *Torres-Sanchez*, "[t]he critical inquiry is whether the officers

2    'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions

3    quickly, during which time it was necessary to detain the defendants.'" *Torres-Sanchez*, 83 F.3d

4    at 1129 (quoting *Sharpe*, 470 U.S. at 686). The Ninth Circuit went on to acknowledge that

5    "'Brevity' can only be defined in the context of each particular case." *Id.* (citing *United States v.*

6    *Place*, 462 U.S. 696, 709 n.10). The court in *Torres-Sanchez* approved the twenty-minute

7    detention at issue. *Id.*

8    A court must consider several factors to determine whether the length of a detention was

9    reasonable. The Ninth Circuit summarized those factors in *Liberal v. Estrada*:

10   > In evaluating the reasonableness of the length of Plaintiff's detention, we "take care
11   > to consider whether the police [we]re acting in a swiftly developing situation" and
     > emphasize that we "should not indulge in unrealistic second-guessing" of the
12   > officers' actions. [*Sharpe*] at 686, 105 S. Ct. 1568. We also consider whether "a
     > suspect's actions contribute to the added delay about which he complains." *Id.* at
13   > 688, 105 S. Ct. 1568. Finally, we determine whether "[i]n attempting to confirm or
     > dispel his suspicions of illegal activity, [the officer] used . . . threats of force,
14   > unnecessary delays, exaggerated displays of authority or other coercive tactics."
     > *Torres–Sanchez*, 83 F.3d at 1129.

15   *Liberal*, 632 F.3d at 1080-81 (alterations in original). Critical to this inquiry in the present case is

16   the undisputed fact that the alleged incident occurred outside the Officer Defendants' view.

17   Although they argue that the incident might have led to a felony arrest, there is simply no evidence

18   to support that contention. Not only did the Officer Defendants refer to it as reckless driving,

19   nothing said by Lamar or Walling at the scene or in deposition raises a legitimate inference of

20   felony conduct. Thus, the detention was based on a completed misdemeanor for reckless driving

21   where there was no report of injury. Although the Ninth Circuit anticipated that such a completed

22   misdemeanor might reasonably be a sound basis for an investigative stop, nothing in *Grigg*

23   suggests that a prolonged stop would pass constitutional muster.

24   In assessing the law enforcement purposes of the detention, the Court acknowledges the

25   importance of maintaining highway safety; calming an escalating confrontation; and obtaining

26   identification of crime suspects. The evidence shows that the Officer Defendants were able to

27   achieve these legitimate purposes in very short order. By 4:30 p.m. – one minute after initiating

28   the detention – the Officer Defendants had taken control of the detention area, identified

27

1   Campbell, and ensured that CHP was notified of the highway incident.  The record shows that the

2   Officer Defendants took longer to identify Anderson, as she refused to give them her driver's

3   license.  However, the detention was not extended by that activity, as the Officer Defendants

4   already were in a "holding pattern" awaiting CHP.  *See* Gordon Dep. 50:2-51:14.  Of particular

5   import here, it is undisputed that the Officers Defendants had the legal authority to investigate

6   alleged crimes occurring on Highway 880 within City limits and possessed the skill and training to

7   do so.  *See* Moscuzza Dep. 50:21-51:4, ECF 42-8.

8          Interestingly, during the detention, other circus employees identified Andersen as the

9   suspect in an assault against them in Oakland, California two days earlier and requested that

10  Andersen be arrested.  The Officer Defendants declined the request, instead reporting the

11  information to the Oakland Police Department.

12         Based on the totality of the circumstances here, the Court finds that holding Plaintiffs for

13  forty minutes was unjustified.  Once it was clear that CHP was not able to arrive with a few

14  minutes, or even five to ten minutes, the efficacy of the holding pattern diminished and the

15  imposition on Plaintiffs' right to freedom of movement became excessive.  The Court is mindful

16  that it is not appropriate for the court to "indulge in unrealistic second-guessing" of the officers'

17  actions.  *See Sharpe*, 470 U.S. at 686.  There is no danger of unrealistic guesswork here, however,

18  because it is undisputed that the Officer Defendants could have investigated but instead held

19  Plaintiffs while idly waiting.  Under these circumstances, the forty-minute detention was unlawful.

20         This case is distinguishable from those in which backup was required for officer safety or

21  the expertise of another jurisdiction was necessary to continue the investigation.  *See, e.g., Sharpe*,

22  470 U.S. at 687 n.5 (approving delay pending arrival of DEA agent with experience in narcotics

23  investigations); *United States v. Villa-Chaparro*, 115 F.3d 797 (10th Cir. 1997) (detention was

24  warranted while waiting for drug sniffing dog); *United States v. Maltais*, 295 F. Supp. 2d 1077

25  (D.N.D. 2003) (same); *United States v. Hbaiu*, 202 F. Supp. 2d 1177 (same).  The Court is

26  familiar with situations in which CHP is called in to conduct field sobriety tests for local police

27  departments who lack the specific skill and experience to administer such important safety tests,

28  and this ruling does not call into question that procedure.

United States District Court
Northern District of California

Based on the foregoing, the Officer Defendants' motion for summary judgment is DENIED on Claim 3, and Plaintiffs' motion for partial summary judgment is GRANTED on Claim 3.  Damages, if any, will be assessed by a jury.

### D.      Punitive Damages (Defendants' Motion)

"In addition to recovery for emotional suffering and humiliation, one subjected to false imprisonment is entitled to compensation for other resultant harm, such as loss of time, physical discomfort or inconvenience, any resulting physical illness or injury to health, business interruption, and damage to reputation, as well as punitive damages in appropriate cases." *Scofield v. Critical Air Medicine, Inc.*, 45 Cal. App. 4th 990, 1009 (1996).  However, under California law a plaintiff may obtain punitive damages only after presenting "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).   Malice is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  *Id.* § 3294(c)(1).  Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  *Id.* § 3294(c)(2).  Fraud is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  *Id.* § 3294(c)(3).

Defendants seek summary judgment that Plaintiffs may not recover punitive damages, pointing to an absence of evidence that the Officer Defendants acted with oppression, fraud, or malice.  As discussed above, the detention did not effect a First Amendment violation, nor did it give rise to liability under the Bane Act.  While the Court has concluded that the duration of the detention did exceed the bounds of the Fourth Amendment, the Court also has concluded that the Officer Defendants reasonably could have believed that it was lawful to go into a holding pattern while awaiting CHP.  In other words, the evidence in the record shows that although the detention did constitute a Fourth Amendment violation, that violation was the result of error as to what the law permitted rather than intentional misconduct.

Because Defendants have pointed to an absence of evidence to support Plaintiffs' punitive

United States District Court
Northern District of California

1    damages claim, the burden shifts to Plaintiffs "to designate specific facts demonstrating the

2    existence of genuine issues for trial." *Oracle*, 627 F.3d at 387.  Plaintiffs argue that punitive

3    damages are warranted because:  "(1) the Milpitas Police department spoke to the truck drivers

4    who were the alleged victims of the reckless driving, and falsely denied so doing; (2) allowed the

5    drivers to leave, and used the drivers' absence to prolong Plaintiffs' detention; and (3) did so with

6    the knowledge of the harm their actions would cause Plaintiffs."  Pls. Opp. to MSJ at 21.  With

7    respect to Plaintiffs' assertion that the Officer Defendants lied about speaking with the truck

8    drivers, Plaintiffs do not cite (and the Court has been unable to locate) any evidence in the record

9    suggesting that the Officer Defendants lied *at the time of the detention*.  To the extent that

10   Plaintiffs assert that the Officer Defendants lied during the course of this litigation – in their

11   declarations, depositions, and motions papers – Plaintiffs do not direct the Court to any authority

12   explaining why those statements would fall outside California's litigation privilege.  *See Optional*

13   *Capital, Inc. v. Das Corp.*, 222 Cal. App. 4th 1388, 1404 (2014) (discussing broad application of

14   litigation privilege).

15          A showing that the Officer Defendants deliberately "used the drivers' absence to prolong

16   Plaintiffs' detention" could support an award of punitive damages.  However, there is no evidence

17   of such conduct.  To the contrary, all of the record evidence suggests that within minutes of the

18   initial stop, the Officer Defendants went into a holding pattern and simply held Plaintiffs pending

19   CHP's arrival.  Once CHP arrived, it was up to *CHP* whether to continue the detention while

20   awaiting the truck drivers.  In fact, CHP chose not to do so and released Plaintiffs before the truck

21   drivers returned.  Based upon this record, no rational jury could find by clear and convincing

22   evidence that the Officer Defendants were guilty of oppression, fraud, or malice.

23          Defendants' motion for summary judgment is GRANTED on Plaintiffs' punitive damages

24   claim.

25          **E.      Injunctive Relief (Defendants' motion)**

26          Finally, Defendants seek summary judgment that Plaintiffs are not entitled to injunctive

27   relief.  However, Defendants devote a scant paragraph to that argument, which contains no citation

28   to case law or other authority.  Defendants have failed to meet their initial burden of

30

1    demonstrating that the record could not support an award of injunctive relief.

2          Defendants' motion for summary judgment on the issue of injunctive relief is DENIED.

3    **IV.    ORDER**

4          (1)    Defendants' motion for summary judgment is GRANTED on Claim 1 (§ 1983),

5                 Claim 2 (Bane Act), and punitive damages, and otherwise is DENIED;

6          (2)    Plaintiffs' cross-motion for partial summary judgment is GRANTED on Claim 3

7                 (false arrest/false imprisonment) and otherwise is DENIED; and

8          (3)    Damages for Claim 3 (false arrest/false imprisonment), if any, will be assessed by a

9                 jury.

10

11   Dated:  March 25, 2015                    _____

12                                             BETH LABSON FREEMAN
                                               United States District Judge
13

United States District Court
Northern District of California

31